**AMTEL, INC., Plaintiff-Appellant,**

v.

**FEDERAL ENERGY ADMINISTRATION and Frank G. Zarb, Administrator of the Federal Energy Administration, Defendants-Appellees.**

No. 5–15.

Temporary Emergency Court of Appeals.

Argued April 27, 1976.

Decided May 25, 1976.

Scott E. Rozzell, Baker & Botts, Houston, Tex., with whom V. Reagan Burch and S. Byron Balbach, Houston, Tex., were on the brief for plaintiff-appellant.

Stephanie P. Lachman, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., and Stanley D. Rose, Atty., Dept. of Justice, Washington, D. C., were on the brief for defendants-appellees.

Before CHRISTENSEN, ESTES and JOHNSON, Judges.

ESTES, Judge.

The instant appeal is the culmination of administrative and judicial proceedings instituted by Amtel, Inc. (Amtel) which resulted in the dismissal of its complaint with prejudice by a final judgment of the United States District Court for the Southern District of Texas, Houston Division, on December 10, 1975. *Amtel, Inc. v. FEA, et al.* (S.D.Tex.Civ.Dkt. No. 75–H–1151, Dec. 10, 1975).

On June 9, 1975, the Federal Energy Administration (FEA) acting on an exception request filed by Whitco, Inc.[1] (Whitco), issued a Decision and Order granting Whitco exception relief from the supplier substitution regulation, 10 CFR § 211.25, and ordering Sun Oil Company (Sun) to begin supplying Whitco with gasoline directly rather than through Amtel and its "integrated" operating division, South Central Oil Company (South Central).[2] *Whitco, Inc.*, Case No. FEE–1434 (filed 2–3–75, decided 6–9–75), 1975 CCH Energy Management Transfer Binder ¶ 83,170. The administrative appeals from the June 9 order filed by Sun and Amtel were denied in a consolidated Decision and Order issued by the FEA on September 26, 1975. *Sun Oil Company, Amtel, Inc.*, Case Nos. FEA–0518 and FEA–0496 (filed 7–14–75 and 7–17–75, decided 9–26–75), 1975 CCH Energy Management Transfer Binder ¶ 80,687.

Whitco requested the FEA in its exception application to assign a new supplier to it in order to alleviate the substantial decline in sales volume, loss of commercial accounts to competitors, and operating losses which it was experiencing due to the high motor gasoline prices it had to pay Sun's substitute supplier under 10 CFR § 211.25 as a result of the sale by Sun of its marketing subsidiary, South Central, to Amtel.[3]

Amtel purchased all of the capital stock of South Central from Sun on March 29, 1974. Sun and South Central entered into a supply contract on the same date which obligated Sun to supply South Central with the same amount of motor gasoline with which South Central had historically been supplied. South Central continued supply-

---

1. As a wholesale purchaser-reseller under 10 CFR § 211.51, Whitco is subject to the mandatory petroleum allocation provision of 10 CFR Part 211. Whitco filed its exception application with the Dallas Regional Office of the FEA on January 16, 1975. Copies of this application were sent by Whitco to Amtel and Sun Oil Company (Sun) pursuant to the notice requirements of 10 CFR § 205.53(a). Amtel and Sun, pursuant to 10 CFR § 205.53, filed comments on Whitco's exception request with the FEA's Dallas Regional Office. The application and filings pursuant thereto were forwarded to and filed with the FEA National Office of Exceptions and Appeals on February 3, 1975.

2. South Central, a wholly owned subsidiary of Sun during the 1972 base period, 10 CFR § 211.102, was and now, as an "integrated" wholly-owned operating division of Amtel, is engaged primarily in selling gasoline to independent jobbers such as Whitco and to service stations owned or leased by South Central. See Amtel Brief p. 7.

3. Under 10 CFR § 211.25(a), "[a]ny supplier may arrange to supply any purchaser which is entitled to receive an allocation from it through another supplier or suppliers in accordance with normal business practices."

ing its customers, including Whitco, following its purchase by Amtel; however, the price which South Central/Amtel charged to Whitco was higher than the price Whitco had formerly paid to South Central/Sun and approximately four cents per gallon higher than the average price paid for gasoline by Whitco's competitors.[4]

Under 10 CFR § 211.9, suppliers of allocated products are required to continue supplying "all wholesale purchaser-resellers and all wholesale purchase-consumers which purchased or obtained that allocated product from that supplier during the base period as specified in Subparts D through K of this part."[5] Subpart F of 10 CFR Part 211 defines base period for purposes of motor gasoline at 10 CFR § 211.102 as the month of 1972 which corresponds to the current month. During this base period, Whitco was purchasing motor gasoline from South Central which at that time was a wholly-owned subsidiary of Sun.

Under 10 CFR § 211.10(a)(2) for purposes of defining a supplier under 10 CFR Part 211, all commonly controlled entities are considered as a single entity[6] and thus Sun, rather than its former wholly-owned subsid-

iary South Central, is Whitco's base period supplier. The effect of the sale of South Central by Sun to Amtel was, pursuant to 10 CFR § 211.25, to make Amtel a substitute supplier of Whitco. The substitute supplier provisions, 10 CFR § 211.25, were intended to afford a degree of flexibility for business and corporate changes in the marketing and distribution systems of a firm since the base period. The use of 10 CFR § 211.25 is subject to the requirement that any substitutions of suppliers made pursuant to it be in accordance with normal business practices. And as stated by the FEA,

> where the application of Section 211.25 results in a purchaser incurring significantly increased costs as compared to those which it would have been charged by its base period supplier in the absence of a supplier substitution, and where such increased costs substantially impair that firm's business operations or threaten its competitive viability, the continued application of the supplier substitution rule could well result in a serious hardship or gross inequity to that firm. Where such a claim of serious hardship or gross inequity is made and properly set forth in an

---

4. The FEA determined in its June 9, 1975 Decision, from the financial data which Whitco provided in support of its exception application, that Whitco was paying South Central/Amtel approximately $.04 more per gallon of gasoline than Whitco's competitors' average per-gallon purchase price for similar product. *Whitco, Inc.*, Case No. FEE–1434 (filed 2–3–75, decided 6–9–75), 1975 CCH Energy Management Transfer Binder ¶ 83,170 at p. 83,556. In its Decision and Order of September 26, 1975 denying Amtel's and Sun's appeal, the FEA indicated that neither Amtel nor Sun had submitted any information which contradicted the agency's determination of the $.04 disparity between Whitco's gasoline purchases and the average price paid by its competitors. In addition, the FEA, sua sponte, made its own survey of the gasoline prices in the relevant market area and found that Amtel's rack price for motor gasoline was still approximately $.03 to $.04 per gallon above competitive levels. *Sun Oil Company, Amtel, Inc.*, Case Nos. FEA–0518 and FEA–0496 (filed 7–14–75 and 7–17–75, decided 9–26–75), 1975 CCH Energy Management Transfer Binder ¶ 80,687 at p. 81,140.

5. Pursuant to the allocation authority vested in the President by section 4(a) of the Emergency

Petroleum Allocation Act, 15 U.S.C. § 753(a) (Allocation Act) (1976 Supp.), and delegated to the Federal Energy Office (FEO) by section 3(a) of Executive Order No. 11748, 38 F.R. 33575 (December 6, 1973), the FEO promulgated the regulation of supplier-purchaser relationships, 10 CFR § 211.24, 39 F.R. 1924 (January 15, 1974). This regulation was subsequently amended and renumbered as 10 CFR § 211.9, 39 F.R. 15960 (May 6, 1974). By Executive Order No. 11790, 39 F.R. 23185 (June 27, 1974), the President abolished the FEO and delegated all of his authority under the Allocation Act to the Federal Energy Administration, which was created by the Federal Energy Administration Act of 1974, 15 U.S.C. § 761 (1976 Supp.). The FEA subsequently republished 10 CFR § 211.9 without substantive amendment, at 39 F.R. 35472 (October 1, 1974).

6. Section 211.10(a)(2) of 10 CFR Part 211 states:

"For purposes of defining a supplier in this part, a firm shall mean the parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls."

application for exception relief, the FEA must evaluate the interests of the parties concerned and the manner in which they have been or will be adversely affected. In appropriate cases, exception relief may well be warranted under which a base period purchaser would not be subject to the supplier substitution provisions of Section 211.25 and its base period supplier would be ordered to furnish it allocated petroleum products directly in accordance with the normal business practices which existed in the base period.

*Whitco, Inc.*, Case No. FEE–1434, *supra*, ¶ 83,170 at p. 83,555.

Based on the data received by it from Whitco and the comments received from Amtel and Sun, the FEA determined that exception relief in *Whitco's* case was warranted, and the FEA granted Whitco an exception from the provisions of 10 CFR § 211.25 and ordered Sun to begin supplying Whitco directly rather than through Amtel, with Whitco's base period volumes for which Sun was responsible. The Order limited the relief to the months of June and July, 1975, with a provision that the Regional Administrator could, upon a determination for any subsequent months, recommend to the National Office that such relief be extended. *Whitco, Inc.*, Case No. FEE–1434, *supra*, ¶ 83,170 at p. 83,557–2.[7]

Believing that it had not been afforded an adequate opportunity to comment on the exception application filed by Whitco and granted by the FEA, Amtel filed a request for a stay of the *Whitco* decision, *Amtel, Inc.*, Case No. FES–0496 (filed 6–24–75, decided 7–8–75), 1975 CCH Energy Management Transfer Binder ¶ 85,043. This request was denied by the FEA, which stated that

in its present posture the record in this entire proceeding contains a strong showing on the one hand by Whitco that the exception relief granted to the firm is necessary on an immediate basis to pre-

vent serious adverse financial consequences to the firm. On the other hand Amtel has submitted no evidence whatsoever which would in any way indicate that the findings made with respect to Whitco were incorrect or that its operations would be placed in any financial jeopardy unless a stay were approved.

*Amtel, Inc.*, Case No. FES–0496, *supra*, ¶ 85,043 at p. 85,105.

Amtel thereafter filed a complaint in the United States District Court for the Southern District of Texas seeking a temporary restraining order against enforcement of the FEA June 9, 1975 order. On July 1, 1975, the court granted the restraining order and, following a hearing on July 10, 1975, the court issued a preliminary injunction further enjoining the FEA from enforcing its June 9 order for a period of 21 days to permit Amtel to pursue any administrative remedies which were available. *Amtel, Inc. v. FEA, et al.* (S.D.Tex.Civ.Dkt. No. 75–H–1151, July 10, 1975).

Amtel filed an administrative appeal of the June 9 order on July 14, 1975, pursuant to FEA regulations, 10 CFR § 205.101, which allows any party aggrieved by an order of the FEA issued under Subpart D, Exceptions, of 10 CFR Part 211, to file an appeal of such order. Sun filed an appeal of the same order on July 17, 1975. On August 8, 1975, the FEA held a conference to hear argument from all parties respecting the pending appeals and possible extension of the relief granted Whitco for June and July, 1975. Amtel, Sun, and Whitco all were in attendance.

In a consolidated Decision and Order on September 26, 1975, the FEA, after receiving and considering updated confidential financial data from Whitco, denied the appeals of Amtel and Sun. *Sun Oil Company, Amtel, Inc.*, Case Nos. FEA–0518 and FEA–0496 (filed 7–14–75 and 7–17–75, decided 9–26–75), 1975 CCH Energy Management Transfer Binder ¶ 80,687. The FEA

---

7. On October 1, 1975, the FEA issued a Supplemental Order granting Whitco an exception for the months of October and November, 1975, in accordance with the June 9 Decision and Order. *Whitco, Inc.*, Case No. FEX–0001 (decided 10–1–75), 1975 CCH Energy Management Transfer Binder ¶ 83,170 at p. 83,557–3.

concluded that Sun and Amtel failed to establish that the June 9 order granting relief to Whitco was erroneous in fact or in law or arbitrary and capricious. The FEA noted the difficulty of dealing with the complexities of the Allocation Act, the application of the Allocation Act to the oil industry across the board, the attainment of all the conflicting objectives contained in the Allocation Act "to the maximum extent practicable," and the balancing of the interests of all parties concerned, stating:

> [N]o regulatory program involving the rigid maintenance of historical relationships can satisfactorily anticipate all situations which might conceivably arise involving the application of the regulations to a particular factual pattern. Consequently, the Congress and the FEA provided that a waiver of the mandatory aspects of those regulations is appropriate in particular situations in which special hardships or inequities result. Emergency Petroleum Allocation Act of 1973, Section 4(b)(3), [(c)](4); Federal Energy Administration Act of 1974, Section 7(i)(1)(D); 10 CFR, Chapter II, Part 205, Subpart D. The mechanism through which such waivers are issued is the exceptions process, which operates in an adjudicatory manner on a case-by-case basis.

*Sun Oil Company, Amtel, Inc.*, Case Nos. FEA–0518 and FEA–0496, *supra*, ¶ 80,687 at p. 81,134.

Following the denial of its appeal, Amtel filed a Supplemental Complaint in the district court asking the court to review and set aside the June 9 and September 26 orders. The district court, after oral argument by counsel and on written briefs from both sides, dismissed the complaint and the instant appeal ensued.

■ On this appeal Amtel claims that the June 9 and September 26, 1975 Decisions and Orders of the FEA were unsupported by substantial evidence, arbitrary and capricious, in excess of the FEA's statutory authority, and a denial to it of procedural due process. Amtel was afforded full and adequate opportunity to review the entire administrative record on which the FEA based its June 9, 1975 decision, except for the more current financial information above mentioned [which was submitted to the FEA by Whitco in confidence, pursuant to 10 CFR § 205.9(f)]. Amtel also participated fully in the agency's consideration of the matter in the course of the administrative appeal of the June 9, 1975 decision and order through normal agency procedures prior to the November 24, 1975 hearing in the district court. There is no indication that any comment by Amtel concerning the updated information would have made any difference in the result or, indeed, that there would have been any different response from Amtel than it had made to Whitco's original submission.[8] And could there be thought in this administrative context any due process problem otherwise, Amtel's failure to exhaust its related administrative remedies, 10 CFR § 205.9(f)(1) and 10 CFR Part 202, and to press the matter before the district court at the November 24, 1975 hearing, renders the point moot here.

**8.** Amtel stated in the July 10 and 11, 1975 hearing before the district court on its application for preliminary injunctive relief that "[w]e would agree that the procedural due process could be cured during the appeal and that's what we're seeking to do. . . . " The district court enjoined the enforcement of the June 9 FEA order, and Amtel thereafter filed its administrative appeal and received a copy of the entire *Whitco, Inc.* file, which included data describing Whitco's historic financial and operational posture up to and including February, 1975. Armed with all of the information and data which was before the FEA on June 9, 1975 and on which the FEA made its decision and orders, Amtel and Sun still failed to submit "any factual information to support [their] allegations, or otherwise demonstrate that the FEA conclusions were in error." *Sun Oil Company, Amtel, Inc., supra*, ¶ 80,687 at p. 81,139. Considering the comments which were submitted by Amtel and Sun, the FEA "determined that Amtel and Sun [had] made no showing which, if considered prior to the issuance of the *Whitco* Decision and Order either alone or in the aggregate would have resulted in any change in the terms of that order." *Sun Oil Company, Amtel, Inc., supra*, ¶ 80,687 at p. 81,137.

■ The judicial review of an agency's interpretation of a statute and regulations promulgated pursuant thereto is a limited one. As this court stated in *Pasco, Inc. v. FEA, et al.*, 525 F.2d 1391, 1400–1404 (Em. App.1975):

It was the duty of the FEA to enact regulations consistent with a proper interpretation of the Allocation Act's objectives and, having done so, to determine the question of the application or nonapplication of such regulations to companies which are within the purview of the Act. In reviewing the discharge of an agency's function in interpreting the Act, promulgating regulations thereunder and applying and enforcing such regulations, this court has recognized that where administrative control has been congressionally authorized, the "judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." *Pacific Coast Meat Job. Ass'n, Inc. v. Cost of Living Coun.*, 481 F.2d 1388, 1391 (Em. App.1973), which was quoting from *Miss. Valley Barge Co. v. United States*, 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260 (1934). See also *Condor Operating Co. v. Sawhill* [514 F.2d 351, 359 (Em.App.1975)], *supra; Reeves v. Simon*, 507 F.2d 455, 460 (Em.App.1974), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975); *Mandel v. Simon*, 493 F.2d 1239, 1240 (Em.App.1974); *University of Southern California v. Cost of Living Council*, 472 F.2d 1065, 1068–1069 (Em.App.1972), *cert. denied*, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973).

. . .

The review of administrative determinations of exceptions from the complex programs necessary to deal with the petroleum industry and the determination of administrative appeals therefrom requires special attention to the "great deference rule" . . . .. Administrative decisions based upon analysis of the data and information submitted on applications for exception relief require the application of administrative expertise, and this court should not be quick to overturn them. In *Consumers Union of U. S., Inc. v. Cost of Living Council*, 491 F.2d 1396, 1403 n. 2 (Em.App.1974), *cert. denied*, 416 U.S. 984, 94 S.Ct. 2387, 40 L.Ed.2d 761 (1974), this court quoted from *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), which stated: "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific."

■ By requiring the attainment of the specified objectives of the Allocation Act "to the maximum extent *practicable*" (emphasis added), 15 U.S.C. § 753(b)(1) (1976 Supp.), Congress recognized that the objectives were to a certain extent inconsistent and intended that the FEA would exercise its discretion in achieving a workable balance among them.[9]

---

9. In the Joint Explanatory Statement of the Committee of Conference on the Allocation Act, the Committee stated:

The listing of objectives in successive paragraphs (A) through (I) in section 4(b)(1) is not intended to establish any order of priority. There are collective goals, and the conferees have not attempted to discern an order of precedence or value one against another. It is fully recognized that, in some instances, it may be impossible to satisfy one objective without sacrificing the accomplishment of another. . . . For this reason the direction to the President is qualified to permit the regulation to be construed so as to accomplish the enumerated objective "to the maximum extent practicable". This qualification is intended to give the President administrative flexibility in marshalling short supplies and equitably assigning them to particular needs.

H.R.Conf.Rep.No.93–628, U.S.Code Cong. & Ad.News, 93d Cong., 1st Sess. p. 2688 (1973).

As this court noted in *Pasco, Inc. v. FEA et al.*, 525 F.2d 1391, 1397 n. 15 (Em.App.1975), the district court in *Union Oil Company of Calif. v. FEA* (C.V. 74–1943-MML, C.D.Ca., July 25, 1974), 3 CCH Energy Management ¶ 26,007, at p. 26,098, stated that the goals of the Allocation Act are "inherently inconsistent, and no regulation could promote all of them at the same time . . . .. A balancing of goals is required, and Congress has left the details of this balancing to the Federal Energy Administration."

■ Amtel's contention that as a "non-branded independent marketer" within the meaning of section 4(b)(1)(D) of the Allocation Act its interests have a priority status and, as such, the FEA's exception order to Whitco is arbitrary and capricious and beyond the FEA's authority, is clearly contrary to this court's statement in *Pasco, Inc. v. FEA et al., supra,* 525 F.2d at 1397, that

[t]he order of the objectives was not intended to establish any priority, nor was it believed that the objectives were all mutually attainable. This court has previously recognized that none of the nine objectives of the Act should be elevated to the level of a mandatory duty and that "the balancing of all objectives is required 'to effectuate maximum achievement of their competing interests.'" *Air Transport Association of America, Trans World Airlines, Inc. v. F.E.O., et al.,* 520 F.2d 1339 (Em.App.1975); *Consumers Union v. Sawhill,* 525 F.2d 1068, rehearing en banc (Em.App.1975), vacating 512 F.2d 1112 (Em.App.1975).

In *Cities Service Co. v. FEA,* 529 F.2d 1016, 1026 n. 16 (Em.App.1975), this court quoted the quite relevant passage from the Supreme Court's decision in *Railroad Com. v. Rowan & Nichols Oil Co.,* 310 U.S. 573, 580–584, 60 S.Ct. 1021, 1024, 84 L.Ed.2d 1368 (1940), which said:

■uch cases are only episodes in the evolution of adjustment among private interests and in the reconciliation of all these private interests with the underlying public interest in such a vital source of energy for our day as oil. Certainly so far as the federal courts are concerned the evolution of these formulas belongs to the Commission and not to the judiciary. A controversy like this always calls

for fresh reminder that courts must not substitute their notions of expediency and fairness for those which have guided the agencies to whom the formulation and execution of policy have been entrusted. . . . It is not for the federal courts to supplant the Commission's judgment even in the face of convincing proof that a different result would have been better.

In this case Whitco provided the FEA with convincing proof that it was suffering a gross inequity and serious special hardship which critically jeopardized Whitco's financial position, necessitating immediate exception relief. By contrast, counsel for Amtel stated in the district court that "we cannot claim and do not claim direct monetary loss because of the FEA order . . . we can only argue that we are faced with possible harm if the market conditions change and the demand for gasoline increases." (Nov. 24, 1975 District Court Hearing, p. 7 of Supplemental Record)

And our decision in *Reeves v. Simon,* 507 F.2d 455 at 460, *cert. denied* 420 U.S. 991, 95 S.Ct. at 1426 (1975), states: "This court has recognized a strong presumption in favor of administrative decisions by those agencies charged with immediate administration of a new federal statute."

■ The Decision and Orders of the FEA under attack were authorized by law, supported by substantial evidence, and were not arbitrary, capricious, erroneous, or otherwise unlawful.

The judgment of the district court is correct and it is AFFIRMED.