WIGGINS BROTHERS, INC.; C. Brodie Hyde; Patricia Hyde; and Frances W. Hyde and First National Bank in Dallas, Co-Trustees of C. Brodie Hyde Trust A, C. Brodie Hyde Trust B, Patricia Hyde Trust A, and Patricia Hyde Trust B, Plaintiffs,

v.

DEPARTMENT OF ENERGY and Charles Duncan, Secretary of Energy, Defendants,

TEXACO INC. and Stanford Harrell, Plaintiffs,

v.

DEPARTMENT OF ENERGY and Charles Duncan, Secretary of Energy, Defendants.

Civ. A. Nos. CA–5–79–144, CA–5–80–149.

United States District Court, N. D. Texas, Lubbock Division.

Sept. 23, 1982.

A. B. Conant, Jr., Karen S. Bedell, Charles W. Pauly, Shank, Irwin, Conant, Williamson & Grevelle, Dallas, Tex., James H. Milam, Crenshaw, Dupree & Milam, Lubbock, Tex., J. Frederick Lawson, Tulsa, Okl., Stephen H. Bard, Texaco Inc., White Plains, N. Y., for plaintiffs.

Alice Daniel, Asst. Atty. Gen., C. Max Vassanelli, Andrew M. Wolfe, Attys., U. S. Dept. of Justice, Nancy C. Crisman, Deputy Asst. Gen. Counsel, Frank W. Krogh, Atty., Samuel Soopper, Staff Atty., U. S. Dept. of Energy, Washington, D. C., James A. Rolfe, U. S. Atty., Dallas, Tex., Clinton E. Averitte, Asst. U. S. Atty., Lubbock, Tex., for defendants.

R. Bruce McLean, Harry R. Silver, Clinton T. Batterton, Akin, Gump, Strauss, Hauer & Feld, Washington, D. C., Michael Lowenberg, Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., Gail F. Schulz, Mobil Oil Corp., Fairfax, Va., for amicus curiae.

Joseph W. Kennedy, Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita, Kan., for all the following listed companies.

Robert F. Ochs, Edward T. Cotham, Jr., The Gulf Companies, Houston, Tex., for Gulf Oil Corp.

Elaine Boze, Sun Oil Co., Dallas, Tex., for Sun Oil Co. (Delaware).

T. L. Cubbage, II, Phillips Petroleum Co., Bartlesville, Okl., for Phillips Petroleum Co.

Gerald Sawatzky, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for Atlantic Richfield Co.

J. Furman Lewis, Marathon Oil Co., Findlay, Ohio, for Marathon Oil Co.

Charles Zubieta, Champlin Petroleum Co., Fort Worth, Tex., for Champlin Petroleum Co.

Michael J. Henke, Ann M. Ashton, Vinson & Elkins, Washington, D. C., for Conoco, Inc.

## MEMORANDUM

WOODWARD, Chief Judge.

Plaintiffs in *Wiggins Bros., Inc. v. Dept. of Energy* are working interest owners of an oil producing property located in Cochran County, Texas. Texaco is the operator and owner of all of the working interest rights in an oil producing property located in Hockley County, Texas and Stanford Harrell is the owner of a royalty interest in said property. Proceedings in the *Texaco—Stanford Harrell* case have been stayed pending the resolution of the *Wiggins* case and the parties in *Texaco—Stanford Har-*

*rell* have agreed that the substantive issue in their case will be governed by the outcome of *Wiggins.*

Defendants in *Wiggins* have moved for judgment on the pleadings, or, in the alternative, for summary judgment. Attorneys for both plaintiffs and defendants filed briefs in support of their respective positions on this motion and participated in oral argument before this court on September 8, 1982. The substantive issue in this case is ripe for resolution.

This suit involves a challenge to the Department of Energy's Marginal Property Rule,[1] as interpreted by the Court of Appeals in *Wiggins Bros., Inc. v. Department of Energy (Wiggins I),* 667 F.2d 77 (Em. App.1981), *cert. denied* —— U.S. ——, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982). In that case the Court of Appeals, reversing this court, found that the phrase "average daily production" had a plain meaning that excluded injection wells from the term "wells that produced crude oil" for purposes of determining whether properties qualified as "marginal" under the rule. 667 F.2d at 89–90. The Court of Appeals has remanded the case to this court for resolution of the remaining issues.

Plaintiffs presently contend that there are only two issues remaining to be resolved by this court: (1) whether the Department of Energy had the statutory authority to exclude injection wells from the definition of "wells that produced crude oil" under the marginal property rule; and (2) whether the Department of Energy's interpretation of the marginal property rule to exclude injection wells was arbitrary and capricious. Defendants contend that these issues are foreclosed by the opinion of the Court of

Appeals in *Wiggins I.* In view of the nature of the remand, this court is constrained to address the issues presented by plaintiffs.

■ The standard for judicial review of actions by administrative agencies, including the promulgation and interpretation of rules and regulations, is set forth at 5 U.S.C. § 706:

The reviewing court shall—

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ...

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; ....

Agency actions found by a court to be either arbitrary and capricious or in excess of statutory authority must be struck down. It is not the responsibility of a reviewing court to re-draft a regulation so that it will conform to the law.[2]

## STATUTORY AUTHORITY ISSUE

■ Regulations, in order to be valid, must be consistent with the statute under which they are promulgated. *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977); *Dixon v. United States,* 381 U.S. 68, 74, 85 S.Ct. 1301, 1305, 14 L.Ed.2d 223 (1965). "In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose." *National Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979).

---

1. The Marginal Property Rule formerly appeared at 10 C.F.R. §§ 212.72, 212.75, 212.76, 212.128, 212.131 (1980). The key provision for purposes of this lawsuit is the definition of the term "average daily production," which formerly appeared at § 212.72:

"Average daily production" means for each particular marginal property the qualified maximum total production of crude oil (excluding condensate recovered in non-associated production) produced from a property, divided by 365 times the number of *wells that*

produced crude oil (excluding condensate recovered from non-associated production) from that property during calendar year 1978. (emphasis added)

2. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–823, 28 L.Ed.2d 136 (1971), and *Bowman Transportation v. Arkansas-Best Freight System,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–442, 42 L.Ed.2d 447 (1974).

Statutory authority for the Marginal Property Rule (MPR), if it exists at all, must be found within the terms of Section 8 of the Emergency Petroleum Allocation Act of 1973 (EPAA), Pub.L.No.93–159, 87 Stat. 627, 15 U.S.C. §§ 751 et seq., as amended by both the Energy Policy and Conservation Act of 1975 (EPCA), Pub.L.No.94–163, 89 Stat. 871, 941, 15 U.S.C. §§ 753–760h, and the Energy Conservation and Production Act of 1976 (ECPA). Pub.L.No.94–385, 90 Stat. 1125, 1133, 15 U.S.C. § 757. The EPAA gave the President authority to promulgate regulations providing for the mandatory allocation of petroleum and petroleum products and also to set prices for such materials. 15 U.S.C. § 753. The EPCA added Section 8 to the EPAA, which gave the President authority to set ceiling prices for the first sale of crude oil produced in the United States. 15 U.S.C. § 757. The EPCA also permitted amendments to the crude oil pricing regulations as production incentives. 15 U.S.C. § 757(d). Eight months after Congress enacted the EPCA, it enacted the ECPA, which removed many of the restrictions on the President's power to set ceiling prices for crude oil which had been included in the EPCA.

During the eight month period following the enactment of the EPCA (December, 1975) and before the enactment of the ECPA (August, 1976), the Federal Energy Administration initiated informal rule making proceedings under 5 U.S.C. § 553 to determine whether additional incentives were necessary to maintain or increase domestic production of crude oil. 41 Fed.Reg. 18873 (May 7, 1976). These proceedings were stayed pending the enactment of the ECPA. In November of 1978 the Department of Energy re-instituted similar proceedings to determine whether, in light of the impact of the ECPA, additional incentives might be necessary to maintain or increase domestic crude oil production. 43 Fed.Reg. 52186 (November 8, 1978). The 1978 proceedings eventually led to the promulgation of the MPR in April of 1979. 44 Fed.Reg. 25160 (April 27, 1979).

It is clear that the Department of Energy had the statutory authority to promulgate the MPR. This authority flows from the following enactments: The Federal Energy Administration Act of 1974, Pub.L.No.93–275, 88 Stat. 96, 15 U.S.C. §§ 761 et seq.; The Department of Energy Organization Act, Pub.L.No.95–91, 91 Stat. 565, 42 U.S.C. §§ 7111 et seq.; and the three Acts discussed above, the EPAA, the EPCA, and the ECPA. While the Department of Energy presently contends that the statutory authority for the MPR lies within the general authority of the agency (Tr. 13 of Hearing September 8, 1982), it cites no specific statute as a basis for this authority. However, at the time the Department of Energy (DOE) first set forth the proposals which later became the MPR, it stated "to the extent that any proposal set forth above, if adopted, would result in any volumes of old crude oil (as defined in the EPAA) being sold prior to June 1, 1979, at prices in excess of the lower tier ceiling price rule, the EPAA Section 8(b)(2) [15 U.S.C. § 757(b)(2)] findings set forth above would be required to be made." 43 Fed. Reg. 52192 (November 8, 1978). This indicates that, at least when it initially proposed the MPR, the DOE felt it was constrained by 15 U.S.C. § 757(b)(2). That subsection deals with amendments to regulations promulgated under 15 U.S.C. § 753(a). This in turn indicates that when DOE initially promulgated the MPR, it felt it was issuing an amendment to its pricing regulations under 15 U.S.C. § 753(a).

It is not necessary to determine with specificity which statutory provisions DOE relied upon when it promulgated the MPR, for plaintiffs do not contend that DOE was totally without statutory authority to promulgate the MPR. Rather, plaintiffs contend only that DOE was without statutory authority to exclude injection wells from the definition of "wells that produced crude oil" in the MPR. (Plaintiffs' Response to Defendant's Motion for Judgment on the Pleadings p. 6). Plaintiffs argue that exclusion of injection wells from the well count in the MPR will have the effect of discouraging the use of injection wells and enhanced recovery techniques. (Id. at

8). Even if this court were to find that the only Congressional purposes in enacting the EPCA were those listed in 15 U.S.C. § 757(d)(3), as plaintiffs suggest, a highly dubious proposition at best, plaintiffs cannot prevail on this point. For plaintiffs cannot seriously contend that the thrust of the MPR is at odds with 15 U.S.C. § 757(d)(3)(C). The MPR clearly does provide an incentive for sustaining production from marginal wells. Without the MPR, owners of qualifying properties would not otherwise have been able to sell their crude oil at prices above the lower tier levels.

Plaintiffs do not contend otherwise. Rather, they claim that "under DOE's interpretation a producer operating a property with low-volume production *could* be discouraged from drilling an injection well or wells on the property to stimulate production because doing so *could* have prevented the property from attaining marginal property status." (Plaintiffs' Response, p. 8, emphasis added.) Plaintiffs fail to realize that the considerations listed in § 757(d)(3) are listed *disjunctively*. An amendment or adjustment of the pricing regulations under that subsection need not further each and every purpose therein. One is sufficient. Therefore, even granting plaintiffs' request and analyzing the MPR under the criteria listed in § 757(d)(3), this court finds that the MPR satisfies that subsection's requirements.

Plaintiffs' argument, in reality, is not that the MPR fails to provide an incentive for sustaining production from marginal wells. Rather, it is that the MPR does not go far enough in providing such an incentive. Their complaint is that *their* properties will only qualify if injection wells are included in the well count. But, as with any benefit, all those who desire it are not always eligible. The courts will not reject an administrative decision merely because one producer's piece of cake is iced and another's is not. *Placid Oil Company v. Federal Power Commission*, 483 F.2d 880, 905 (5th Cir. 1973), *affirmed sub nom. Mobil Oil Corp. v. FPC*, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974).

DOE was well within its statutory authority when it promulgated the MPR, as interpreted in *Wiggins I*.

## ARBITRARY AND CAPRICIOUS ISSUE

Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." The agency must articulate a "rational connection between the facts found and the choice made." While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*Bowman Transportation v. Arkansas-Best Freight System*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–442, 42 L.Ed.2d 447 (1974) (citations omitted).

As stated above, DOE felt constrained by the requirements of § 8(b)(2) of the EPAA (15 U.S.C. § 757(b)(2)) when it initially proposed the MPR. 43 Fed.Reg. 52192 (November 8, 1978). That paragraph states in relevant part:

(2) No amendment to the regulation under section 753(a) of this title made after December 22, 1975, may permit, ... an increase in the price for any volume of old crude oil production from any priorities [sic], unless the President finds that such amendment—

(A) will give positive incentives for (i) enhanced recovery techniques, or (ii) deep horizon development, from such properties; or

(B) is necessary to take into account declining production from such properties; and

(C) is likely to result in a level of production from such properties beyond that which would otherwise occur if no such amendment were made. 15 U.S.C. § 757(b)(2).

The administrative record clearly demonstrates that DOE gave extensive consideration to these factors during the notice and comment proceedings. The notice of final rulemaking, as corrected, contains concise analyses of each of the mandatory considerations contained in § 757(b)(2). 44 Fed. Reg. 25161–67 (April 27, 1979). DOE's consideration of the § 757(b)(2) factors is also apparent from both the Draft Regulatory Analysis of the MPR (Admn.Rec. 42–79) and the Final Regulatory Analysis of the MPR (Admn.Rec. 149–79).

Plaintiffs also claim that DOE's promulgation of the MPR was arbitrary and capricious because DOE failed to consider the nine factors listed at 15 U.S.C. § 753(b)(1).[3] (Plaintiffs' Response, pp. 8–11). Plaintiffs' reliance on *Mobil Oil v. Dept. of Energy,* 610 F.2d 796 (Em.App.1979), in this respect is misplaced. In *Mobil* the DOE attempted to promulgate an amendment to pricing regulations without complying with the procedural requirements of the Administrative Procedure Act, 5 U.S.C. § 553. 610 F.2d at 802. DOE also admitted that it had given *no consideration* to the relevant factors. 610 F.2d at 801–02. In the present case, however, DOE fulfilled all the mandates of 5 U.S.C. § 553. *See* 43 Fed.Reg. 52186 (November 8, 1978). DOE's compliance with these procedural requirements gave the public an opportunity to comment on any and all aspects of the proposed MPR, including the exclusion of injection wells from the well count. The administrative record in this case includes an Environmental Impact Statement. This Environmental Impact Statement includes analyses of Stage III proposed rulemaking pursuant to the EPCA. (EIS pp. I–13–14). The MPR was promulgated in 1979 after DOE re-instituted similar rulemaking procedures. 44 Fed.Reg. 25161 (April 27, 1979). The Environmental Impact Statement includes (1) analyses of the environmental impacts of secondary recovery techniques (EIS pp. IV–20–22), and tertiary recovery techniques (EIS pp. IV–35–108); (2) an analysis of the impacts on production and price levels of several alternative pricing scenarios (EIS pp. VI–1–32); and (3) an analysis of the environmental impact of alternative pricing scenarios, including their impact on socioeconomic factors, air and water quality (EIS pp. VII–1–38). Taken in conjunction with

---

**3.** (b)(1) The regulation under subsection (a) of this section, to the maximum extent practicable, shall provide for—

(A) protection of public health (including the production of pharmaceuticals), safety and welfare (including maintenance of residential heating, such as individual homes, apartments and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;

(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of, exploration for, and production or extraction of—

(i) fuels, and

(ii) minerals essential to the requirements of the United States,

and for required transportation related thereto;

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

the notice of final rulemaking and the two analyses of the MPR discussed above, these materials support a finding that DOE made all the necessary considerations with regard to promulgating the MPR.[4]

The court finds that DOE has satisfied the three prongs of the *Bowman* test. The MPR, in its final form, represents the result of a careful consideration of the relevant factors. DOE did not make a clear error in judgment in promulgating the MPR in its final form. Finally, in its analyses of the proposed and final forms of the MPR, DOE has rationally explained the choices it made in promulgating the MPR.

Plaintiffs' challenge to the MPR is slightly more narrow than a claim that the promulgation of the rule was an arbitrary and capricious action by DOE. Plaintiffs seek to invalidate the MPR only insofar as it excludes injection wells from the well count. Their theory is that DOE's exclusion of such wells from the well count is an arbitrary and capricious action.

It is not at all clear whether plaintiffs may logically seek to invalidate *only* an interpretation of a rule promulgated pursuant to 5 U.S.C. § 553, where the interpretation in question was included in both the original notice of proposed rulemaking and the notice of final rulemaking. Logic would seem to dictate that if a rule, as interpreted in the notice of final rulemaking, is arbitrary and capricious, then the entire rule must fall. Leaving this point aside, however, it is quite clear at this point that there is nothing either arbitrary or capricious with the exclusion of injection wells from the MPR's well count. In *Wiggins I* the Court of Appeals held that the exclusion of injection wells in determining the average daily production of crude oil is consistent with the "plain meaning" of the phrase "wells that produced crude oil." 667 F.2d at 89–90. It cannot be seriously con-

tended that it is either arbitrary or capricious for an agency to interpret its own rules in a manner consistent with the "plain meaning" of the language contained in those rules. Yet this is precisely what plaintiffs would have this court hold.

In its notice of final rulemaking, DOE states that it borrowed certain interpretations of the language in the MPR from its prior interpretations of the stripper well exemption because "the concept of marginal property is analogous to a stripper well property, and because the calculations to be used in determining a property's qualifications as a marginal property are similar to those used in determining a property's qualifications under the stripper well property exemption." 44 Fed.Reg. 25164 (April 27, 1979). Administrative convenience and simplicity are certainly proper considerations in any agency rule making.

■ Upon thorough examination of the administrative record in this case, it is clear that DOE has acted neither arbitrarily nor capriciously in either promulgating the MPR or interpreting its provisions.

OTHER REMAINING ISSUES

■ In plaintiffs' original complaint they challenged the MPR on procedural as well as substantive grounds. However, in their most recent brief they suggest that their procedural challenges are foreclosed by *Wiggins I.* Without reaching any decision on that contention, this court finds that DOE fully complied with all of the procedural requirements of 5 U.S.C. § 553 in promulgating the MPR.

■ In their latest brief plaintiffs also allege that there are questions of fact still before this court which preclude a ruling in favor of defendant's motion for summary judgment. Yet plaintiffs have already admitted that the only issues remaining be-

4. "The judicial review of an agency's interpretation of a statute and regulations promulgated pursuant thereto is a limited one. By requiring the attainment of the specified objectives of the Allocation Act 'to the maximum extent *practicable*' (emphasis added), 15 U.S.C. § 753(b)(1) (1976 Supp.), Congress recognized that the ob-

jectives were to a certain extent inconsistent and intended that the FEA would exercise its discretion in achieving a workable balance among them." *Amtel, Inc. v. Federal Energy Administration,* 536 F.2d 1378, 1383 (Em.App. 1976).

fore this court are those previously discussed. Whether an action by an agency is either outside its statutory authority or arbitrary and capricious are questions of law.[5] The fact that reference to the administrative record is necessary to make such determinations does not alter this fact. The "questions of fact" which plaintiffs allege are still before this court (Plaintiffs' Response pp. 8–9) have already been considered by DOE in its two analyses of the MPR and are not justiciable issues, but rather legislative considerations, best left to the judgment of rule making authorities.[6] It is not within the province of this court to re-write regulations based upon economic considerations.[7]

Finally, plaintiffs claim that the Court of Appeals lacked jurisdiction to decide *Wiggins I* and that therefore this court is free to ignore the opinion in that case. This court respectfully declines this invitation to judicial insubordination. Plaintiffs have brought forward no viable authority for their assertion. It is not generally the duty of a district court to determine the jurisdiction of an appellate court following the receipt of a remand from that appellate court. Furthermore, plaintiffs failed to raise this point on appeal earlier. In such a circumstance, this court will not attempt to determine the jurisdiction of the Temporary Emergency Court of Appeals.[8] It is enough for this court that the Court of Appeals felt it had jurisdiction to reach the merits of the issues presented in *Wiggins I.*

Therefore, the defendants' motion for judgment on the pleadings is denied and the defendants' motion for summary judgment in *Wiggins* is granted. Defendant Department of Energy is instructed to draft and submit to this court a judgment in favor of defendants in that case. This decision also disposes of the substantive issues in *Texaco—Stanford Harrell,* but not the issue of what remedy, if any, is to be afforded the parties in that case. The remaining issue of remedy in *Texaco—Harrell* will be dealt with by this court pursuant to the briefing schedule previously issued.

---

**5.** *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–824, 28 L.Ed.2d 136 (1971). *See also Standard Oil Co. v. Department of Energy,* 596 F.2d 1029, 1039 (Em.App.1978).

**6.** Plaintiffs allege that this court must determine numerous factual matters "such as the effect of injection wells on a property's production and the extent to which enhanced recovery techniques would be discouraged by an interpretation of the MPR excluding injection wells. Also *an economic analysis must be performed* to determine the extent to which the supply of fossil fuels would be decreased by excluding injection wells from the definition of 'wells that produced crude oil' for purposes of the MPR." (Plaintiffs' Response pp. 8–9, emphasis added). But so long as the MPR, as interpreted, provides at least *some* positive incentive for sustaining production from marginal wells, it will conform to the statutory mandate of 15 U.S.C. § 757. DOE was under no obligation to promulgate the MPR. In such a circumstance, it is not up to this court to determine how much *more* incentive would result from including injection wells in the MPR's well count. Yet this is precisely the type of inquiry suggested by plaintiffs.

**7.** *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 792–93 n.15, 98 S.Ct. 2096, 2110–2111 n.15, 56 L.Ed.2d 697 (1978), *Addison v. Holly Hill Fruit Products, Inc.,* 322 U.S. 607, 619, 64 S.Ct. 1215, 1222, 88 L.Ed. 1488 (1944), *McCulloch Gas Processing v. Dept. of Energy,* 650 F.2d 1216, 1229–30 (Em. App.1981).

**8.** "The Temporary Emergency Court of Appeals (TECA) has 'exclusive jurisdiction of all appeals from the district courts of the United States in cases and controversies arising under the EPAA or under regulations or orders issued thereunder.'" *United States v. Wyatt,* 680 F.2d 1080, 1083 (5 Cir. 1982).