**DORCHESTER GAS PRODUCING COMPANY, Dorchester Gas Processing Company, Exxon Corporation, Texaco Inc., Mobil Oil Corporation, and Mobil Oil Exploration & Producing Southeast Inc., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF ENERGY and James Edwards, Secretary of Energy, Defendants.**

Civ. A. No. CA–3–75–0836–W.

United States District Court,
N.D. Texas,
Dallas Division.

June 24, 1983.

W.B. Browder, Jr., Stubbeman, McRae, Sealy, Laughlin & Browder, Midland, Tex., for Dorchester.

M.W. Parse, Jr., Jerry E. Smith, A. Frank Koury, Fulbright & Jaworski, Houston, Tex., M.W. Parse, Jr., Fulbright & Jaworski, Washington, D.C., Louis J. Weber, Jr., Jenkins & Gilchrist, Dallas, Tex., Barbara Finney, Houston, Tex., for Exxon.

Neil J. King, Wilmer, Cutler & Pickering, Washington, D.C., for Phillips.

David R. Noteware, Thompson & Knight, Dallas, Tex., Michael J. Henke, C. Michael Buxton, Thomas A. Stout, Jr., William D. Holyoak, Vinson & Elkins, Washington,

D.C., Stephen H. Bard, Texaco Inc., White Plains, N.Y., for Texaco.

Michael Lowenberg, Akin, Gump, Hauer & Feld, Dallas, Tex., Charles S. Lindberg, Donald E. Marquardt, New York City, E.S. McCrum, Mobil Oil Exploration & Producing, New Orleans, La., Michael Lowenberg, R. Bruce McLean, Danield Joseph, Harry R. Silver, Leslie K. Dellon, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for Mobil.

Robert F. VanVoorhees, Kirkland & Ellis, Washington, D.C., Lawrence G. Newman, Newman, Shook & Newman, Dallas, Tex., for Standard Oil.

Barbara A. Babcock, C. Max Vassanelli, Mellie H. Nelson, Civil Div., U.S. Dept. of Justice, Don W. Crockett, Mark Kreitman, Thomas A. Schweitzer, John L. Gurney, Dept. of Energy, R. John Seibert, Federal Programs Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., James A. Rolfe, U.S. Atty., Charles Cabaniss, Asst. U.S. Atty., Dallas, Tex., Clinton E. Averitte, Roger L. McRoberts, Asst. U.S. Attys., Lubbock, Tex., for defendants.

## MEMORANDUM OPINION

### WOODWARD, Chief Judge.

Each party to this consolidated action has filed its motion for summary judgment pursuant to Rule 56, F.R.Civ.P., and memorandum in opposition to the motion of the opposing party. Each party contends that the material facts are undisputed to support summary judgment in its favor and that material issues of fact exist which necessarily defeat the opposing motion. The court is of the opinion that the merits of this case can be resolved by summary judgment, that the material facts in the record before the court are undisputed in support of the judgment hereinafter ordered, and that only questions of law remain for resolution. This memorandum opinion shall constitute findings of fact from the undisputed evidence and conclusions of law.

## BACKGROUND

The regulatory history behind promulgation of the pricing regulations at issue in this case has been heretofore discussed by the Temporary Emergency Court of Appeals (TECA). However, a short reiteration of that background may be helpful to an understanding of the controversy presented here.

In 1973, the Congress of the United States enacted the Emergency Petroleum Allocation Act (EPAA), 15 U.S.C. §§ 751, *et seq.* Under authority of the EPAA, the Federal Energy Administration (FEA), predecessor to the Department of Energy (DOE), enacted regulations concerning, *inter alia,* the pricing of natural gas liquids (NGL's) and natural gas liquid products (NGLP's). Subpart E, 10 C.F.R. §§ 212.81, *et seq.,* among the earliest of the regulations, was applicable to the extraction and pricing of NGL's by crude oil refiners. From the inception of the Subpart E regulations, however, the government placed gas processors within the broad category of "refiners" and considered the rules and procedures of that Subpart to be equally applicable to the gas processors. *National Helium Corp. v. FEA,* 569 F.2d 1137, 1145 (TECA 1977).

Soon after promulgation of the Subpart E regulations, it was recognized that the framework of price regulation for oil refiners was not well suited to gas processors. Accordingly, the FEA proposed and enacted a new Subpart K program of pricing regulations specifically applicable to the natural gas processors. The Subpart K rules became effective on January 1, 1975. These regulations, for the first time, attempted to specify the method for computing product costs of NGL's.

The plaintiff oil companies have challenged both the substantive and procedural validity of the regulations under Subparts E and K, as well as the DOE interpretation of various aspects of those regulations. These challenges will be discussed under separate headings although they are interrelated in many respects.

## SUBPART K

The Subpart K regulations allowed the pass through, as an increased product cost, the "increased cost of natural gas shrinkage" to the price of NGL's. It is the computation of this cost of "shrinkage" which is at the heart of the controversy under Subpart K.

"Cost of shrinkage" is defined at 10 C.F.R. § 212.162 as:

[t]he reduction in selling price per thousand cubic feet (MCF) of natural gas processed, which is attributable to the reduction in volume or BTU value of the natural gas resulting from the extraction of natural gas liquids, as determined pursuant to the contract in effect at the time for which cost of natural gas shrinkage is being measured, and under which the *processed* natural gas is sold. (emphasis added)

The DOE contends that this definition, when read in conjunction with the definition of "increased product costs," clearly reflects the agency's intent in promulgating the regulations that the increased product costs which could be passed through by the gas processor to the price of the extracted liquids was to be based upon the *weighted average* of all sales of the residue gas during the period of measurement. "Increased product costs" is defined at 10 C.F.R. § 212.167(b) as follows:

(b) Increased product costs are ... (3) the difference between the weighted average cost of natural gas shrinkage per thousand cubic feet (MCF) of natural gas processed in the month of May 1973, and the weighted average cost of natural gas shrinkage per thousand cubic feet (MCF) of natural gas processed in the current month, multiplied by the number of thousand cubic feet (MCF's) of natural gas processed in the current month.

Plaintiffs contend that the clear language of the regulations, and particularly the definition of "cost of shrinkage," permits them to pass through to the price of NGL's their "lost opportunity" cost, which is the price at which the shrinkage volume *could have* been sold had it not been used

for extraction of the NGL's. In this regard, plaintiffs contend that fixed price contracts existing on the date of measurement are irrelevant to a determination of their lost opportunity costs or to a determination of the price at which the volume of natural gas could have been sold had it not been used to make up the NGL's. Plaintiffs further contend that the DOE interpretation, which would require consideration of existing fixed-price contracts in calculating "cost of shrinkage," would be contrary to the Congressional mandate expressed in the EPAA that price regulations allow a dollar-for-dollar pass through in net cost increases to covered products. *See* 15 U.S.C. § 753(b)(2)(A). Lastly, plaintiffs argue that the DOE interpretation would extinguish economic incentive for NGL extraction, thus violating the purpose of the EPAA and the regulations promulgated thereunder.

■ The requirement that deference be given to administrative interpretation of its own regulations when that interpretation is not plainly erroneous has been clearly enunciated by the United States Supreme Court in *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965):

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given statute by the officers or agency charged with its administration. 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' (cites omitted) ... *when the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.* (emphasis added)

■ It is the opinion of the court that DOE's interpretation requiring a weight-averaging of the sales of residue gas under all existing contracts during the current month, including existing long-term, fixed-

price contracts, for purposes of determining cost pass throughs to NGL prices is neither plainly erroneous nor contrary to the regulatory language and should be given deference.

Under normal circumstances a gas processor processes a stream of wet natural gas through a plant, extracting the liquids therefrom. In the extraction process, the gas stream loses either volume or BTU content or both. Thus, the residue gas, or that gas which exists after processing, has a reduced selling price. For example, if 100,000 MCF's are measured into the gas plant and only 75,000 MCF's or equivalent BTU's remain after extraction, there is a shrinkage loss of 25,000 MCF's or equivalent BTU's. DOE contends that the cost of shrinkage is to be computed by weight-averaging the selling price of the 75,000 MCF's existing after extraction. Thus, if the 75,000 MCF's sell for $1.00 per MCF on a weighted average basis, for a total of $75,000, then the cost of shrinkage for the month in question would be $25,000. Plaintiffs contend that in determining whether or not to extract NGL's from a wet gas stream, they will consider the price they could receive for the wet stream if sold without liquid extraction. Thus, using the example above, if plaintiffs could sell 100,-000 MCF's of unprocessed gas for $2.00 per MCF, or $200,000, while receiving only $75,000 for the residue gas after processing, then the option to extract would never be exercised. By letter dated June 20, 1983, after oral argument, counsel for plaintiffs also contend that fixed price contracts under which the processed gas is sold is irrelevant in determining the weighted average and only the price for which the processed gas remaining after fulfilling the fixed price contract is sold is relevant in determining the permissible

cost of shrinkage. Plaintiffs reason that there is no shrinkage in the amount of gas sold under the fixed price contracts as these contracts were fulfilled, hence no cost of shrinkage is incurred.

Plaintiffs' interpretation would permit only the use of the market or unregulated price for which the remaining gas could be sold. The definition of "cost of shrinkage," however, speaks in terms of the selling price of the *processed* natural gas,[1] which would necessarily include the *processed* gas sold under the fixed price contracts and which would necessarily exclude the price for which any *unprocessed* gas is sold or could have (lost opportunity) been sold. Consideration of the sales prices of gas on the unregulated market would defeat the intent of controlling NGL prices. The plain language of the regulation thus supports the DOE interpretation and accordingly, that interpretation is not plainly erroneous.

■ The court also rejects plaintiffs' argument that the agency's own interpretation of the shrinkage provisions of Subpart K supports opportunity costing and rejects the weighted-average method of pricing NGL's. Three of the "interpretations" upon which plaintiffs rely[2] are of little value and not controlling in that they do not constitute official agency interpretation of the regulations. The two formal interpretations issued by DOE's Office of General Counsel upon which plaintiffs rely do not support their theory that the shrinkage provisions allow for shrinkage calculations to be based on the market or "theoretical" value of natural gas. To the contrary, the Kansas-Nebraska Interpretation 1978–41, 43 Fed.Reg. 29548 (July 10, 1978), which involved primarily the issue of the effect of

---

1. *See* 10 § 212.162 ("[c]ost of shrinkage is the reduction in selling price ... as determined pursuant to the contract in effect at the time for which cost of natural gas shrinkage is being measured and under which the *processed* natural gas is sold.")

2. The "incremental costing letter" from Larry White, DOE's Regional Director of Compliance for Region VI to Texaco, the "Janoski Memoran-

dum," and "Clarification 78–3" are all in the nature of informal advice by agency employees which do not have the stature of official agency interpretations through DOE's Office of General Counsel and accordingly, are to be accorded little weight for purposes of regulatory interpretation. *See Pennzoil Co. v. United States Department of Energy,* 680 F.2d 156, 171 (TECA 1982).

contract BTU adjustment clauses on calculation of the cost of shrinkage, contains strong language refuting the notion that lost opportunity costs can be recouped on a dollar-for-dollar basis through the prices of NGL's.[3]

Plaintiffs allege that there has been an additional contemporaneous interpretation of the "cost of shrinkage" that supports their argument. Sun Oil Company Interpretation 1978–37, (43 Fed.Reg. 29543 (July 10, 1978)), does allow Sun Oil, under the very limited facts presented, to ignore and not consider certain transactions in the removal of NGL's from natural gas in calculating shrinkage costs. Under the facts considered in this particular interpretation, it appears that the gas subject to the long-term contract with Sun Oil was owned by third parties and the title to this gas did not pass to Sun Oil, but Sun merely extracted the NGL's and returned the residue gas to the third party together with sufficient portion of its own gas to replace the loss of BTU's. DOE correctly held in this interpretation that there should be no consideration of the transactions between Sun and the third parties because it appears that there was not a "sale" from the third party to Sun or from Sun to the third party, but on the contrary, title to the third party's gas remained in the third party and only the title to the extracted NGL's passed to Sun. Under this fact situation there was no relevant sales price to be considered in determining a weighted average price. It should be emphasized that

this interpretation was some three years after Subpart K became effective and was limited to the particular facts presented. Further, it was noted in the interpretation that under ordinary circumstances, "the sales of *all* residue gas which has been processed will be used to measure shrinkage cost." *Id.* Since there was not a sales of residue gas from Sun to the third party owner but merely a replacement by Sun of the loss of BTU's, this does not constitute an applicable contemporaneous agency interpretation of the language under Subpart K that would support plaintiffs' "opportunity cost" methodology under ordinary circumstances.[4]

■ It is the plaintiffs' position that if the court gives deference to the DOE interpretation of the Subpart K regulations, then those regulations should be found invalid in that they are arbitrary and capricious. In determining whether a regulation as promulgated is arbitrary and capricious, the court must determine whether in enacting the regulation, the agency (1) made a clear error of judgment (2) considered the relevant factors, and (3) articulated a rational basis for the rule adopted.[5] *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). Plaintiffs contend that the pricing provisions under Subpart K, if given the DOE interpretation, lack any rational basis and were enacted based on a clear error of judgment in that the regulations, as so

**3.** "... While the opportunity costs described as increased shrinkage costs are the equivalent of increased product costs, such 'costs' do not represent outlays of dollars and therefore cannot literally be recouped on a dollar-for-dollar basis. Furthermore, the implicit extension of Kansas-Nebraska's position is that all opportunity costs associated with the production of covered products must be recovered on a dollar-for-dollar basis. Such general application of § 4(b)(2)(A) would arguably render unlawful any price limitations preventing the opportunity to sell covered products at a price reflecting the 'free market value' of the covered products in relation to unregulated products or activities theoretically available to the processor. Such a result would mean that the products generally must be priced at their current market value, a result incompa-

tible with the very existence of price controls...." 43 Fed.Reg. at 29550.

**4.** DOE in its reply brief, page 76, seems to concede that in this limited context, a gas processor would be permitted to exclude from shrinkage computation the natural gas processed under this exact factual situation as such a transaction would be "unrelated" to NGL extraction.

**5.** TECA, in analyzing whether the agency has "articulated a rational basis for the rule adopted," has been primarily concerned with whether the enacted regulation has a rational basis or demonstrates a rational connection with the stated policies and objectives of the regulations. *See, e.g., Mobil Oil Corporation v. DOE,* 610 F.2d 796, 801 (TECA 1979).

**918**

interpreted, conflict with the agency's stated purpose and ignore the economic realities of gas processing. Further, plaintiffs contend that in promulgating the regulations, DOE did not consider "factors of obvious relevance to the mechanistic application of a weighted-average residue sales price methodology," such as "the quantity limitation of fixed-quantity contracts" and "the presence of opportunity costs despite the absence of residue sales from cycling plants."

■ The court is of the opinion that the pricing regulations as promulgated under Subpart K, and as interpreted by the DOE, are not arbitrary and capricious. While a reviewing court may not supply a reasoned basis for agency action that the agency itself has not given, it "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman, supra,* at 285–86, 95 S.Ct. at 441–42.

The FEA, in the preamble to the Subpart K regulations, acknowledged that there was no single ideal solution to the regulation of natural gas liquid prices and stated that the regulations as promulgated were a necessary compromise among the conflicting considerations which existed. "... [T]he fundamental objective is to permit prices that will be as low as reasonably possible without adversely affecting the availability of the product." 39 Fed.Reg. 44408 (December 24, 1974). In this regard, the agency explained that it was adopting a "cost-based" system with respect to the pricing of natural gas liquids which continued in effect the reference point of May 15, 1973, from which increased costs and lawful prices were to be determined, with a provision for the addition of an increment to the May 15, 1973 selling prices to account for the "actual increased cost of natural gas shrinkage attributable to the production of natural gas liquids since that date." *Id.* In explaining the reference to the May 1973 pricing of NGL's, the agency noted that "[t]his method of price determination serves, in general, to preserve a seller's May 15, 1973 margin (i.e., the difference between May 15, 1973 product costs and May 15, 1973 selling prices) and to provide for a dollar-for-dollar pass through of increased product costs." *Id.*

Plaintiffs now contend that because they are precluded under the DOE interpretation of the regulations from increasing their profit margin from what it was in May 1973, they are precluded from passing through, on a dollar-for-dollar basis, their increased *costs* of extraction. DOE recognized that its cost-based system of regulation would limit the profit margin to be received by gas processors from the NGL's, yet, as explained in the preamble, chose this structure in an effort to keep prices as low as possible without adversely affecting supply. Plaintiffs maintain that the cost-based system, as interpreted by DOE, creates disincentive, contrary to Congressional mandate, in that no refiner or processor who can receive a greater profit by selling natural gas in its raw state would ever opt to extract NGL's. It was an agency judgment, however, that if the profit margin received from sale of NGL's in May 1973, at a time when the market was unregulated, was sufficient incentive at that time for NGL extraction, that same profit margin would or should spark incentive during the period of regulation. Whether or not that assumption was totally realistic, this court cannot find on the basis of the record that the regulation lacks a rational basis or that the agency made a clear error in judgment in light of its duty to *regulate* the prices of NGL's. Price control, to some degree, will always disregard or distort economic reality and the record does not reflect that undue distortion resulted or would have resulted had there been a clearer understanding in the industry of the agency's intention regarding cost pass-through.

The court further finds that the agency, in enacting the pricing provisions in question, did not fail to consider the relevant factors. Congress required in § 4(b)(2)(A) of the EPAA, 15 U.S.C. § 753(b)(1)(I), that the President, in enacting pricing regulations to deal with the existing shortages of

crude oil and refined petroleum products, provide *to the maximum extent possible* for

(D) preservation of an economically sound and competitive petroleum industry; including the priority need to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers and branded independent marketers.

\* \* \* \* \* \*

(H) economic efficiency, and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

Additionally, the agency was required by Congress to formulate price regulations which would allow a "dollar-for-dollar pass through in net cost increases" to the regulated products. 15 U.S.C. § 753(b)(2)(A).

"By requiring the attainment of the specified objectives 'to the maximum extent *practicable*,' Congress recognized that the objectives were to a certain extent inconsistent and intended that the FEA would exercise its discretion in achieving a workable balance among them." *Amtel, Inc. v. Federal Energy Administration*, 536 F.2d 1378, 1383 (TECA 1976). *See* also House Report No. 93–531, 93rd Cong., 1st Sess. (1973), *reprinted in* U.S.Code Cong. & Ad. News, 2582, 2594 (1973). ("The list of objections set forth in subsection (b) is *not* a schedule of priorities. The President is directed to accomplish all of these objectives to the maximum extent that may be practicable" (emphasis supplied).

In addition to the EPAA requirements, DOE was also faced with two conflicting objectives in formulating price regulations for NGL's: 1) the need to foster industry incentive for NGL extraction; and 2) the need to keep prices as low as possible for the NGL consumers. Subpart K Preamble, *supra.*

The administrative record reflects that due consideration was given to the issue of whether the necessary objectives could best be served by placing a ceiling on the price of NGL's as opposed to permitting a flexible price based on the varying costs of natural gas and crude oil.[6] Similar consideration was given to the issue of whether the proposed regulations reflected appropriate profit margins to stimulate NGL extraction.[7] Specific discussion was given to the proposed provisions on shrinkage, though it is interesting to note that calculation of shrinkage cost per se did not appear to be of great concern to the industry at the time of the public hearings on promulgation of proposed regulations.[8]

The court concludes, after thorough examination of the administrative record, that the agency gave consideration to factors relevant to accomplishing, to the maximum extent practicable, the objectives and duties imposed upon it by Congress.

■ DOE's contention that the challenges to the pricing provisions under Subpart K are barred by laches is rejected. The original complaint which gave rise to

**6.** *See:* Statement of P.E. Goth, Jr., Marketing Manager for Liquified Petroleum Gas, Phillips Petroleum Co. (opposing a price ceiling); Statement of Jones Landry, General Counsel, Air Transport Association of America (ceiling price necessary); Statement of Ben Vaughn, III, Normanne Gas Processing Plant (fixed price ceiling helpful).

**7.** *See:* Statement of Victor Cino, President, Association of Shell Dealers, Inc. (proposed profit margin inflationary); Statement of John Orr, Executive Secretary, Oklahoma LP-Gas Association (proposed profit margin acceptable), Statement of Don Weems, Executive Secretary, Missouri LP-Gas Association (proposed profit margin acceptable); Statement of Terrence Redmond, Vice President, Planning and Administration, Amoco Oil Co. (limitation on profit margin should be eliminated); Statement of J.W. Kinnear, Texaco Inc. (proposal to restrict profit margin unacceptable).

**8.** In responding to a question of whether the proposed regulations permitting NGL prices to reflect shrinkage costs would improve the competitive situation of small independent gas processors, Mr. Richard L. Cook, President of McCulloch Gas Processing Corp., stated, "No. It is not that big of a deal. It is a very small part of the recovery costs, very minor...."

this lawsuit was filed in 1975, only months after promulgation of Subpart K. That complaint substantively raised the issues on which declaratory judgment is now sought. Thus, the court finds that issues involved here were presented in a timely fashion and that their resolution should not be precluded on that basis.

### SUBPART E

Pursuant to the initial "Phase IV" price regulations, the Cost of Living Council promulgated Subpart E, 10 C.F.R. §§ 212.81 *et seq.*, in 1973. Subpart E remained in effect through the calendar year 1974 and governed prices charged by refiners for their produced NGL's. The regulations, which referred specifically to refiners, were construed to apply to the sale of NGL's by natural gas processors. *National Helium Corporation v. FEA*, 569 F.2d 1137, 1145 (TECA 1977). These regulations specifically recognized transfer prices between "affiliated companies" for the purpose of calculating a refiner's increased costs. *Gulf Oil Corporation v. DOE*, 671 F.2d 485, 487 (TECA 1982).

During the Subpart E period, plaintiffs calculated "increased product costs" for its internally produced NGL's by assigning a transfer price to the raw natural gas from which liquids were extracted based on current market value of the gas. This transfer price was then compared to the intrafirm transfer price for natural gas during the month of May 1973 which was derived on the same basis, with any increase passed through as an increased cost of NGL production.

Plaintiffs contend that intrafirm transfer prices were derived through use of the firm's historic accounting procedures and that the regulations specifically allowed use of historic or customary accounting procedures in calculating increased product costs. DOE contends that use of customary accounting procedures was allowed under the regulations only in computing costs of foreign or imported crude, 10 C.F.R. § 212.83(b), and that the phrase had no applicability to domestically produced NGL's. Further, DOE contends that the Subpart E regulations specifically contemplated that only *actual* increased product costs could be passed through to the price of NGL's and that the intrafirm transfer prices assigned by plaintiffs to natural gas did not reflect actual cost increases.

■ The issue for the court is whether plaintiffs' pricing of internally produced NGL's during the Subpart E period was reasonable in light of the regulatory language and purpose. The court finds that it was not.

It is clear that Subpart E was intended to apply to transfers between affiliated entities under certain circumstances specified therein. Specifically, in calculating "increased product costs," 10 C.F.R. § 212.-83(b), refiners were required to compute the difference in the cost of crude petroleum during the month of measurement and compare it to the cost of crude petroleum during May 1973. In calculating this cost of crude, the regulation further required that for transactions between affiliated entities involving new domestic crude, the cost which was to be imputed was the "posted" price. For transactions between affiliated entities involving imported crude, the regulations permitted use of customary accounting procedures for computation of costs of crude petroleum which could ultimately be used in computation of increased product costs. This use of customary accounting procedures was subject, however, to the right of the Federal Energy Office (FEO) to allocate costs between affiliated entities if, in its judgment, such allocation was necessary to reflect *actual costs* to the affiliated entities. *See* 10 C.F.R. § 212.-83(e). Thus, while the regulations permitted use of customary accounting procedures in deriving a price for foreign crude oil purchased in transactions between affiliated entities, the agency expressed its concern that such price be reflective of actual costs to the affiliated entities involved. The court agrees with DOE that to the extent plaintiffs were assigning prices on intrafirm transfers of NGL's based upon factors other than actual increases in costs

of NGL production, the practice was unreasonable and contrary to the regulations.

This finding is supported by the preamble to the Emergency Amendment to the Special Propane Rule, 39 Fed.Reg. 28608 (August 9, 1974), wherein the agency clarified that "[i]n the case of domestic natural gas liquids and propane, it is clear that no increased costs should be attributed to transactions with affiliated entities, and this has therefore been made explicit in the new rule." Plaintiffs contend that this amendment pertained only to propane and that the preamble therefore provided no guidance whatever for NGL pricing in general. Further, plaintiffs contend that the emergency amendment to the propane rule was procedurally invalid and thus of no force and effect. While the propane amendment dealt specifically with computing a base price for propane, the preamble thereto served to place the industry on notice of the agency view of the effect of affiliate transfers on pricing of domestic NGL's under Subpart E. Further, the agency finding and explanation that promulgation of the amendment was necessary without opportunity for notice and comment inasmuch as "announcement of the rule as a proposal would involve substantial likelihood that supply patterns would be disrupted in anticipation of the adoption of the proposal," and that "[s]uch disruption would be particularly injurious to the public welfare in view of the need for propane ... as the harvesting and heating seasons approach ...," satisfied the requirements for waiver of notice set forth at 15 U.S.C. § 766(i)(1)(B). The facts in the record are undisputed that it was the critical need for natural gas liquids, particularly propane and butane, which gave rise to the NGL pricing regulations in the first instance.

The court further finds that during the Subpart E period there was no official agency interpretation to support plaintiffs'

pricing method for internally produced NGL's.[9]

Plaintiffs contend that if the court finds that they were not permitted to use their "historical accounting methods" in calculating the increased costs of NGL's prior to January 1, 1975, they are entitled to calculate the cost of NGL's based upon the increase in the value of natural gas shrinkage. The court agrees that on May 27, 1975, the FEA announced in its Ruling 1975–6, 40 Fed.Reg. 23272 (1975), that the shrinkage cost provisions of Subpart K were to be applied retroactively to NGL pricing during the Subpart E period. Accordingly, the court finds that during the Subpart E period, plaintiffs were entitled to calculate costs of NGL's pursuant to the shrinkage provisions of Subpart K as construed herein.

Finally, DOE's argument that Texaco Inc. has no standing to urge acceptance by the court of the opportunity cost pricing method for NGL's during the Subpart E period is rejected. In *United States of America v. Texaco, Inc.*, Civil Action No. CA–79–0031, the DOE filed complaint against Texaco asserting violations by Texaco of Subpart E for using the opportunity costing method of pricing NGL's. Thus, DOE's argument that Texaco never utilized such a method during the Subpart E period cannot be entertained, and under the circumstances, Texaco has standing to assert that argument.

## VOLUME—PROCESSED FORMULA

10 C.F.R. § 212.167(b) provides for the "volume of gas processed" method of calculating shrinkage costs. In specifying the "increased product costs" which could be passed through to the price of NGL's, the regulations required comparison of:

> ... the difference between the weighted average cost of natural gas shrinkage *per thousand cubic feet (MCF) of natural gas processed* in the month of May

---

**9.** Plaintiffs' argument that the agency's contemporaneous construction of Subpart E is supportive of their pricing method for internally produced NGL's is based upon informal agency advice which this court cannot consider as controlling official agency interpretation of its regulations. *See Pennzoil, supra.*

1973, and the weighted average cost of natural gas shrinkage *per thousand cubic feet (MCF) of natural gas processed* in the current month, multiplied by the number of thousand cubic feet (MCF's) of natural gas processed in the current month. 10 C.F.R. § 212.167(b) (emphasis added).

Plaintiffs challenge both the substantive and procedural validity of this "volume of gas processed" formula, hereafter referred to as "volume-processed" formula.

### a. *Procedural Issue*

At the time of the adoption of Subpart K, the FEA was required to follow the procedural requirements for rule-making set forth in the Administrative Procedure Act (APA) and in the Federal Energy Administration Act. *Standard Oil Co. v. DOE*, 596 F.2d 1029 (TECA 1978). Plaintiffs contend that the DOE failed to observe the APA provisions which require the agency to give notice of the terms or substance of the proposed rule or a description of the subjects and issues involved. 5 U.S.C. § 553(b). Plaintiffs also contend that the agency disregarded the FEAA requirement that notice of any proposed rule or regulation be given by publication in the Federal Register and that a minimum of ten days following such publication be provided for opportunity to comment. 15 U.S.C. § 766(i)(1)(B). In this regard, plaintiffs contend that final version of the volume-processed formula was so far afield from the proposed regulation that, in addition to the lack of notice, the FEAA requirement of publication of the regulation was violated. Finally, plaintiffs challenge the procedural validity of the formula on grounds that the agency failed to publish with the final regulation a statement of basis and purpose of the selected rule as required under § 553(c) of the APA. The court finds that all of the procedural challenges discussed above are without merit.

The formula, as it appeared in the Subpart K proposal, read as follows:

Increased product cost with respect to a gas plant is ... (b) the difference between the weighted average cost of natural gas shrinkage in the month of May 1972 [sic] and the weighted average cost of natural gas shrinkage in the month of measurement, multiplied by the volume of natural gas processed in the month of measurement, where:

"Cost of natural gas shrinkage" means the reduction in sales price of natural gas, *per unit of volume or BTU content, of natural gas processed* in a gas plant which is attributable to *reduction in volume or BTU content* by the removal of liquids in the gas plant. 39 Fed.Reg. 32730. (September 10, 1974)

It is the opinion of the court that the regulation as proposed in the Federal Register (and particularly the proposed definition of "cost of shrinkage") provided fair notice that the agency contemplated calculating increased product costs for NGL's on the basis of *volume* of gas processed rather than on the basis of shrinkage volume alone. Further, the court is of the opinion that the formula, as finally promulgated, did not alter the implicit requirement that the regulations allow for a dollar-for-dollar pass through of increased costs and accordingly did not require reiteration of its basis and purpose.

### b. *Substantive Issue*

Plaintiffs contend that notwithstanding any procedural defects in the enactment of the volume-processed formula, the regulation must be stricken as arbitrary and capricious under the three-pronged *Bowman* test. The thrust of plaintiffs' argument in this regard is that because the formula does not consistently allow for a dollar-for-dollar pass through of costs to the price of NGL's, it must be stricken as having been enacted pursuant to a clear error in judgment, with no rational basis, and without consideration of the relevant factors.[10] As

---

**10.** Plaintiffs support their argument that the formula does not allow dollar-for-dollar pass through by using two examples attached hereto, and the position of DOE is as illustrated by the affidavit of Neely W. Tipton, all of which are

indicated above, the court is of the opinion that the formula as enacted does not negate the Congressional mandate that increased costs be recovered on a dollar-for-dollar basis.

Plaintiffs contend that by making increased costs a function of the volume of gas processed rather than of the shrinkage volume, irrelevant factors are considered and actual costs are not reflected. That is, according to plaintiffs, the formula considers the volume of gas *not* converted into NGL's in addition to the volume which is converted to arrive at the shrinkage cost. This, plaintiffs contend, allows two gas processors who have the same shrinkage volume and the same residue gas prices in the current month to have different shrinkage costs. DOE does not dispute that the formula can yield such a result, but contends that such a result is reasonable since in that example, the two gas processors processed different volumes of gas to arrive at the same volume of shrinkage. Thus, according to DOE, the formula operates to reward the more efficient processor who increases his extraction rate over that of another processor from the same volume of gas.

DOE further contends that the formula automatically operates to leave both gas processors with the same *net* improvement in revenue for the combined sale of residue gas and NGL's.

That is, according to DOE, there is a direct correlation between NGL's extracted and the volume of residue gas remaining after extraction in that lesser shrinkage from a given stream of natural gas (whether due to gas plant inefficiency or a decline in the stream's liquid content) yields a greater volume or BTU content in the resi-

due gas which can in turn be sold by the processor.

■ The court agrees that the formula as enacted served to equalize the net revenues received by two gas processors with different extraction rates.[11] Thus, the formula cannot be said to have created disincentive in the industry for NGL extraction. Further, the formula served to keep NGL prices low for the consumer. Accordingly, the court finds that the formula had a rational connection with the stated purpose of the regulations and was not based upon a clear error of judgment.

Furthermore, the court finds that the formula did not ignore the dollar-for-dollar pass through requirement of the EPAA. Since the formula permits two processors who consume different volumes of natural gas in producing the same quantity of NGL's to recover the same revenue or profit upon sale of the combination of processed NGL's and residue gas, there is no preclusion in recovery of costs. Since the formula is not contrary to the Congressional mandate and furthers the regulatory objectives, the court cannot find that the agency failed to consider relevant factors prior to its adoption. Accordingly, the court cannot find the volume—processed formula to be arbitrary and capricious.

### THE ETHANE EXCLUSION

Plaintiffs challenge both the substantive and procedural validity of the ethane exclusion under Subpart K. Ethane was one of the NGL's which was not among the products subject to price control under the EPAA. 15 U.S.C. § 752(5) and (6). Subpart K, however, attempted to exclude from the cost of shrinkage any increased product cost attributable to ethane. 10

---

attached hereto as appendices. [Appendices deleted for purposes of publication.]

**11.** Plaintiffs' theory would allow a processor with a lesser extraction rate to pass through to the price of NGL's the same costs as the processor with the greater extraction rate and at the same time permit the former processor to

receive a greater price on the sale of its residue gas since either the volume or BTU content of that residue would be greater given the lesser liquid extraction. Such a theory is not only inequitable when considered from the standpoint of the processor who achieves a greater rate of extraction but is unreasonable in light of the regulatory objectives.

C.F.R. § 212.168(a).[12] The relevant formula required, in essence, that the total increased product cost be reduced by an amount of increased product cost attributable to ethane. Thus, if 10% of the volume of NGL's processed was ethane, then the amount of increased product cost resulting from shrinkage would be reduced by that percentage.

Plaintiffs challenge the ethane exclusion provision, contending that the formula arbitrarily and capriciously allocates an excessive portion of shrinkage costs to ethane.[13] The procedural validity of the rule is challenged on the basis that DOE allegedly gave no notice that it planned to include an ethane allocation provision in Subpart K which precluded opportunity for industry comment. The procedural challenges will be addressed first.

Plaintiffs contend that the ethane allocation provision appeared for the first time in the final version of Subpart K and state that it was a completely novel provision. DOE challenges the assertion that the provision was new, contending that it was the same formula, known as the "V Factor," which was a part of the old Cost of Living Council (CLC) regulations and which was recodified under Subpart E.

On April 30, 1974, the V Factor, as it appeared under Subpart E, was amended.[14] Shortly after the April 30 amendment, on September 10, 1974, the Subpart K proposal was issued. According to DOE, the Subpart K rules were to be an adjunct to Subpart E for the purpose of NGL costing and thus, the Subpart E rules were to apply to gas processing and sale of NGL's except to the extent that they were modified or superseded by Subpart K. In this regard, proposed § 212.144, "Application of Increased Costs," read in pertinent part:

> Any firm which incurs increased product costs or increased non-product cost with respect to processing or fractioning natural gas liquids in a particular plant may pass such costs through, *in accordance with the cost pass through provisions for increased costs of Subpart E.* 39 Fed.Reg. 32730 (September 10, 1974) (emphasis added).

DOE contends that this provision placed the industry on notice that the agency would continue all existing rules under Subpart E, including the V Factor which required volumetric allocation of increased product costs to ethane and other exempt products. After the agency's decision to make Subpart K a separate set of regulations applicable solely to gas processors, the V Factor, as it related to ethane (the only exempt product for natural gas processing) was "transferred" to Subpart K. According to DOE, the transfer was merely a "technical amendment" which did not impose a substantive change in the duties and obligations of the regulated parties, and thus, did not require prior notice and opportunity for comment.

In 1978, the Temporary Emergency Court of Appeals (TECA) declared the V Factor, as it existed under Subpart E, to be both substantively and procedurally invalid. *Mobil Oil Corp. v. DOE,* 610 F.2d 796 (TECA 1979). In *Mobil,* TECA held that the April 30, 1974 amendment to the V

---

12. 10 C.F.R. § 212.168(a) provides in relevant part:

  (a) Exclusion of increased product costs attributable to ethane. The total amount of increased product costs attributable each month to a given volume of natural gas shall be reduced each month by an amount equal to the product of the increased product costs multiplied by $(Ve^u/V^u)$.

  $V^u$ = the total volume of natural gas liquid products and ethane derived from that volume of natural gas and sold in the current month and

$Ve^u$ = the total volume of all ethane derived from that volume of natural gas and sold in the current month.

13. The record indicates that ethane has only slightly more than fifty percent of the BTU content per MCF than other NGL's.

14. The amendment provided that costs attributable to a particular product would be calculated on the basis of the following formula:

VOLUME OF PARTICULAR PRODUCT SOLD
VOLUME OF ALL COVERED AND NON-COVERED PRODUCTS SOLD.

10 C.F.R. § 212.83(c)(2).

Factor from which the Subpart K ethane exclusion was taken, was null and void as having been promulgated in violation of the notice and comment provision of the APA. *Id.* at 804. The court also found that DOE's action in promulgating the amendment to be arbitrary and capricious in that the agency failed to consider the relevant factors or objectives set forth in the EPAA. *Id.* at 801–802.

Although DOE may be correct in its position that at the time the ethane exclusion was promulgated, it considered that its action was only a "technical transfer" which required no further notice and opportunity for comment, the "transfer" was of a provision which has been conclusively determined to have been null and void, procedurally and substantively. It would be unreasonable to find that the transfer to a new subsection gave the provision new life. The ethane exclusion provision has, in effect, been determined by a final decision of TECA to be invalid, and this court cannot find to the contrary.

DOE's contention that the doctrine of laches prevents any judgment on behalf of the plaintiffs on the ethane exclusion is rejected. Laches is not available as a defense where, as here, the regulation in question has been ruled null and void.

### LEASE METER ISSUE

Subpart K, on its face, is silent on the issue of whether the volume of gas to be processed into NGL's was to be measured by utilizing meters located in the field near the producing wells or by meters located at the processing plant. DOE contends that the definition of shrinkage itself and the agency's early interpretations require that the reduction in the volume of gas due to extraction of the liquids be measured within the confines of the gas plant where the extraction process occurs. Plaintiffs, Exxon and Texaco, always measured the volume of gas processed by the plant meters

and accordingly have no argument with DOE on this issue. Mobil, however, measured the wet stream prior to NGL extraction through its lease meters located in the field, which Mobil contends were its most accurate meters and the meters it used for accounting purposes. Measurement by use of field meters was reasonable and justified, according to Mobil, in view of regulatory silence on the issue. Further, Mobil contends that its practice furthered the purpose of Subpart K in that it provided a full dollar-for-dollar compensation of costs of NGL extraction.

The court agrees with the DOE that measurement of the volume of gas processed from the field meters is not a reasonable interpretation of the Subpart K shrinkage provisions. While plaintiffs may be correct that the inception of the extraction process is when the processor takes possession of the natural gas in the field, the purpose of the shrinkage provisions, as clearly stated in the preamble, was to compensate the processor for reduction in sales revenues received from the natural gas because of the reduced gas volume or BTU content of the gas *after processing.* 39 Fed.Reg. 44409 (Dec. 24, 1974). That is, the purpose of the shrinkage provisions was to compensate for volume reduction resulting from extraction, not for line loss which occurred from the lease to the plant.

Additionally, Mobil cannot seriously contend that it remained totally in the dark after Ruling 1975–18, 40 Fed.Reg. 55860 (December 2, 1975) as to which meters it could properly utilize to measure its volume processed. Early in that ruling, the agency clarifies that "[t]o qualify as an increased product cost, any shrinkage cost must be *related to the extraction process,* which the FEA defines to include *only the extraction of natural gas liquids from the 'wet' gas stream.*" 40 Fed.Reg. at 55861. (emphasis added). That "cost of shrinkage" was to be limited to those costs close-

ly related to the *extraction* of natural gas liquids was again emphasized in the agency's discussion of treatment of condensate:

> ... [a]ny reduction in the value of 'wet' natural gas which results from the separating out of condensate lacks the requisite connection with the extraction of natural gas liquids, even though both processes may be performed at the same processing facility by the same party. *Id.* at 55862.

Finally, discussion in the ruling of "inlet" meters has reference to those meters located at the plant facility. This, too, is clarified in the agency's discussion of the treatment of condensate for purposes of shrinkage:

> In yet other cases, condensate is not separated from natural gas until it reaches a mechanical separation device *similar to a* surface separation or *field facility, but located instead at the inlet side of a gas processing plant* ... and, in that case, the condensate is referred to as 'plant condensate.'
> *Id.* at 55861.

Thus, the court cannot find that the agency's statement in September 1978, in the preamble to the Subpart K amendments, that the " 'inlet' of a gas plant remains the inlet to the extraction plant proper ...," constituted a retroactive interpretation of the regulations or that the statement fundamentally altered Subpart K in violation of § 553 of the APA. The court concludes that Mobil's measurement practices were inconsistent with the clear language of Subpart K and constituted an unreasonable construction of the shrinkage provisions.

## THE DORCHESTER CLAIM

Dorchester Gas Producing Company and Dorchester Gas Processing Company (Dorchester) instituted this action seeking declaratory judgment that Subparts E and K are unlawful and void, particularly as applied to independent gas processors. The Dorchester action was consolidated in this case with similar actions instituted by other named plaintiffs. Dorchester has largely adopted the position taken by the other plaintiffs, discussed above, and the rulings stated above on the various issues discussed are equally applicable to the plaintiff Dorchester. In its brief, however, Dorchester has made certain arguments which it contends are unique to its own situation.

Dorchester, a natural gas processor, contends that the language of Subpart E addresses itself *only* to crude oil refiners and that those regulations, when applied to natural gas processors, are confusing and ambiguous. The applicability of Subpart E to gas processors, Dorchester contends, is an unresolved issue. Further, Dorchester argues that the regulations under Subparts E and K which tie shrinkage costs to contract prices for sales of the residue gas is discriminatory to Dorchester and other gas processors similarly situated in that a great majority of the natural gas processed by those companies was sold in interstate commerce and thus regulated by price ceilings set forth by the Federal Power Commission (FPC). The FPC price ceilings, according to Dorchester, "are established in a manner totally unrelated to replacement costs." (Page 11, Dorchester's reply brief in opposition to defendants' motion for summary judgment.) Finally, Dorchester contends that the retroactive application of Subpart K, as announced in Ruling 1975–6, *supra,* does little to alleviate the hardship which the Subpart E regulations imposed on processors in Dorchester's position. In this regard, Dorchester claims that the ruling, allowing natural gas processors to use the Subpart K shrinkage provisions for recovery of increased product costs for the pre-1975 period (by permitting the pre-1975 increased costs to be added to the processors' "banks" for future pass throughs) was of no benefit to those such as Dorchester which had sold or disposed of its processed NGL's prior to May 1975.

TECA, in *National Helium Corporation v. FEA, supra,* has conclusively ruled that the Subpart E regulations, although written with the crude oil refiner in mind, were equally applicable to natural gas processors. In that opinion, TECA noted that although the Subpart E regulations were not well suited to achieve a particular goal, this did not "necessarily mean that the parties subject to those rules may avoid their application by claiming they were not on notice, especially where, as here, the agency continuously asserted that the parties were subject to the agency's authority." 569 F.2d at 1144. Without deciding whether Dorchester properly interprets Ruling 1975–6, this court is bound by *National Helium* and cannot find the Subpart E regulations null and void or inapplicable to Dorchester. Further, the court finds that the challenge to Subpart K on the grounds of its discriminatory effect on Dorchester, without more, is insufficient to justify a finding that the regulatory scheme is arbitrary and capricious. This court will not reject an administrative decision "merely because one producer's piece of cake is iced and another's is not." *Placid Oil Company v. Federal Power Commission,* 483 F.2d 880, 905 (5th Cir.1973), *affirmed sub nom. Mobil Oil Corp. v. FPC,* 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974).

Accordingly, with regard to the Subpart E issue, the shrinkage provisions under Subpart K, the volume—processed formula issue and the lease meter issue, the court hereby grants defendant-DOE's motion for summary judgment and denies plaintiffs' corresponding motion thereon. The court further grants DOE's motion for summary judgment with regard to the Dorchester issues. With regard to the ethane exclusion issue, the court hereby grants plaintiffs' motion for summary judgment and denies DOE's corresponding motion thereon.

The attorneys will confer and submit to the court a judgment in accordance with this order.